UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                       :

SMJ GROUP, INC., CIELI PARTNERS, L.P.,   :
BROOKLYN DINER USA, L.P.,           :

                       :

               Plaintiffs,     :

                       :       06 Civ. 1774 (GEL)

       -against-          :

                       :      **OPINION AND ORDER**

417 LAFAYETTE RESTAURANT LLC, THE   :
RESTAURANT OPPORTUNITIES CENTER OF :
NEW YORK, INC., JOHN DOES 1-58, JOHN  :
ROES 1-50,                  :

                       :

              Defendants.   :

                       :
-------------------------------------------------------------x

Thomas E. Budd and Arthur J. Robb, Clifton
Budd & DeMaria, LLP, New York, New York,
for Plaintiffs.

H. Christopher Boehning, Paul, Weiss, Rifkind,
Wharton & Garrison LLP, New York, New York,
for Defendants.

GERARD E. LYNCH, District Judge:

       Plaintiffs have moved to preliminarily enjoin defendants from distributing certain leaflets

that contain plaintiffs' trademarks outside of plaintiffs' restaurants.  The Court held a hearing on

March 7, 2006, at which time the Court denied plaintiffs' motion for a temporary restraining

order.  The parties subsequently briefed the instant motion, and for the reasons below the Court

now denies plaintiffs' request for a preliminary injunction.

# BACKGROUND

The relevant facts are not in dispute.[1] Plaintiffs own two restaurants that are at the center of this dispute: Trattoria Dell'Arte at 900 Seventh Avenue, New York, New York, and Brooklyn Diner USA at 212 West 57th Street, New York, New York. Defendant The Restaurant Opportunities Center of New York, Inc. ("ROC") is a non-profit organization that seeks to improve conditions for New York City's restaurant workers.[2] As part of this mission, ROC "works to establish and maintain worker-owned cooperative restaurants." (Robb Aff. Ex. A ¶ 3.) One such restaurant is Colors Restaurant, which is operated by defendant 417 Lafayette Restaurant LLC ("417 Lafayette") at 417 Lafayette Street, New York, New York. ROC owns a 40% interest in 417 Lafayette.[3]

Beginning in March 2006, defendants began stationing individuals outside Trattoria Dell'Arte and the Brooklyn Diner to hand out the leaflets that are the subject of this dispute. Each leaflet is essentially a single sheet of paper folded in half to create a pamphlet. The front of

---

[1] The parties do dispute facts that are irrelevant to the current motion. First, the parties disagree about a dispute between the defendants and Redeye Grill – a restaurant that is not involved in this litigation – currently proceeding both in New York State Supreme Court and the National Labor Relations Board. (Compare Pl. Mem. 5, with Def. Mem. 3.) Because the dispute involving Redeye Grill is not before this Court, the parties' disagreements regarding facts related to that matter are of no concern. Second, defendants dispute plaintiffs' allegations that the content of the leaflets at issue is "false and defamatory." (Compare Pl. Mem. 7, with Def. Mem. 4.) Plaintiffs do not raise a defamation claim in support of their motion for a preliminary injuction, and so the Court need not address plaintiffs' allegations in that respect.

[2] Defendants did not submit any affidavits or other evidence in connection with the instant motion. Instead, defendants cite to the ROC website – http://www.rocny.org – for information relating to the organization.

[3] Defendants John Does 1-58 and John Roes 1-50 are employee-owners of Colors and outside-owners of Colors, respectively.

the leaflet displays the trademarked logo of one of plaintiffs' restaurants,[4] along with the text

"SPECIAL FOR YOU." On the inside of the leaflet, the left side contains the text "DO YOU

REALLY WANT TO EAT HERE?" and the right side contains the text:

> Workers from this restaurant company have sued the company in
> Federal Court for misappropriated tips and unpaid overtime hours
> worked. More than 50 current and former workers from the
> restaurant company approached the Restaurant Opportunities
> Center of New York, complaining of misappropriated tips, unpaid
> overtime wages, racial and gender discrimination, sexual
> harassment, harsh working conditions in the restaurant, and
> retaliation for speaking up for their rights.

> SUPPORT THE WORKERS IN THEIR STRUGGLE FOR
> DECENT WORKING CONDITIONS!

> FOR MORE INFORMATION, PLEASE CALL ROC-NY (THE
> RESTAURANT OPPORTUNITIES CENTER OF NEW YORK)
> AT 212-343-1771.

The back of the leaflet contains the text:

> The Restaurant Opportunities Center of New York (ROC-NY) is a
> non-profit organization that seeks improved working conditions for
> restaurant workers citywide. ROC-NY assists restaurant workers
> seeking legal redress against employers who violate their
> employment rights. ROC-NY seeks to provide customers and the
> public with information about the litigation in this restaurant
> through these handbills, not to picket or interfere with deliveries.
> ROC-NY is not a labor organization and does not seek to represent
> the workers or be recognized as a collective bargaining agent of
> the workers at this restaurant.

## DISCUSSION

Plaintiffs' motion for a preliminary injunction is based on their claims that defendants'

distribution of the above-described leaflets infringes on their trademarks in violation of the

---

[4] Defendants do not dispute that the leaflets contain plaintiffs' trademarks.

3

Lanham Act, 15 U.S.C. §§ 1114, 1125, and dilutes their trademarks in violation of the Lanham Act, 15 U.S.C. § 1125 and N.Y. Gen. Bus. Law § 360-*l*.

To obtain a preliminary injunction, plaintiffs must demonstrate both (1) a likelihood of irreparable harm in the absence of relief and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions regarding the merits along with a showing that the balance of hardships favors the injunction. 1-800 Contacts, Inc. v. WhenU.com, Inc., 414 F.3d 400, 406 (2d Cir. 2005).

I. Likelihood of Success of Plaintiffs' Infringement Claims

Plaintiffs bring their claims of trademark infringement under 15 U.S.C. §§ 1114, 1125(a). Section 1114 prohibits "the [unauthorized] use in commerce [of another's trademark] in connection with the sale, offering for sale, distribution, or advertising of any goods or services . . . [if] such use is likely to cause confusion, or to cause mistake, or to deceive." Section 1125(a) prohibits the unauthorized use "in commerce" and "in connection with any goods or services" of "any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the . . . origin, sponsorship, or approval of [the unauthorized user's] goods, services, or commercial activities by another person."

To succeed on these claims, plaintiffs must prove four elements: (1) that they possess the trademarks at issue, (2) that defendants' use of the marks is in commerce, (3) that defendants' use of the marks is in connection with goods or services, and (4) that the defendants' use of the marks is likely to cause confusion. With respect to the first element, defendants concede that plaintiffs are the trademark holders for the logos displayed on the covers of defendants' leaflets.

A.  Use of the Trademark In Commerce

The second element – whether defendants' use of plaintiffs' marks is in commerce – is a question regarding the extent of Congress's commerce power, because Congress's use of the phrase "in commerce" in the Lanham Act "reflects Congress's intent to legislate to the limits of its authority under the Commerce Clause."  United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc., 128 F.3d 86, 92 (2d Cir. 1997).  Given the broad scope of Congress's commerce power, and given that plaintiff businesses engage in interstate commerce – commerce that is alleged to be adversely affected by defendants' use of their trademarks – plaintiffs are likely to satisfy this element of their claim.  See, e.g., Gonzales v. Raich, 125 S. Ct. 2195, 2206 (2005) ("when 'a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.'" (quoting United States v. Lopez, 514 U.S. 549, 558 (1995))).

B.  Use of the Trademark in Connection with Goods or Services

Defendants contend that their use of plaintiffs' marks is not in connection with goods or services because their use is "for an 'expressive purpose' and as part of a 'communicative message' of criticism or commentary."  (Def. Mem. 9.)[5]  The scope of the Lanham Act, however, is not so narrow.  Defendants claim that they are a "non-profit organization that endeavors to raise awareness of restaurant employees' abyssmal [sic] work conditions."  (Id. 4.)  To that end, "[t]he circulation of leaflets is . . . in furtherance of their mission to educate the public."  (Id.) Such activities would generally be considered a public *service* in the normal sense of those

_____

[5] Defendants do not attempt to refute plaintiffs' infringement claims element by element. Instead, they argue as a general matter that the Lanham Act does not reach defendants' activity because it is protected by the First Amendment.  (Def. Mem. 5.)

words.  Similarly, defendants' activities qualify as "services" as defined by the Lanham Act.

"The term 'services' has been interpreted broadly" by our Court of Appeals, and various courts have applied the Lanham Act against "defendants furnishing a wide variety of non-commercial public and civic benefits." United We Stand, 128 F.3d at 89-90 (citing examples such as fraternities, the Special Olympics, half-way houses, purchasing gifts for orphans, community programs, and other community affairs).  For example, the defendant in United We Stand used a trademark in connection with political organizing, establishing a party office, recruiting politicians, issuing press releases, endorsing candidates, and distributing political literature.  The Court of Appeals stated that it had "no doubt" that these activities, "[a]lthough not undertaken for profit, . . . unquestionably render a service." Id.  This conclusion follows from the fact that "communicating ideas and purveying points of view is . . . a service subject to the controls established by trademark law." Id. at 91.  Defendants seek to educate the public, an admirable service, but an individual being educated should not be misled about the source of that education, just as an individual purchasing a can of peas should not be misled about the source of those peas.  Rogers v. Grimaldi, 875 F.2d 994, 997 (2d Cir. 1989) ("The purchaser of a book, like the purchaser of a can of peas, has a right not to be misled as to the source of the product.").

Defendants do not argue, nor could they, that their use of plaintiffs' marks is not in connection with their "mission to educate the public." (Def. Mem. 4.)  Instead, defendants rely on the fact that their use is in connection with expressive activity and not a "for-profit scheme." (Id.)  However, as United We Stand makes clear, defendants' lack of profit motivation does not place their activities beyond the scope of the Lanham Act's definition of "services." Plaintiffs' marks are clearly displayed on the front of the pamphlets distributed by defendants, and the

distribution of those educational leaflets is a service under the Lanham Act. Accordingly, defendants' use of plaintiffs' marks is in connection with services as defined by the Act.

    C. Likelihood of Confusion

    To satisfy the fourth element of their infringement claim, plaintiffs must show that defendants' use of their marks is likely to cause confusion. In this Circuit, the likelihood of confusion is traditionally evaluated using the factors laid out by our Court of Appeals in Polaroid Corp. v. Polorad Elecs. Corp., 287 F.2d 492 (2d Cir. 1961). In this case, however, application of the so-called Polaroid factors is unnecessary and unhelpful, because the parties essentially agree that there *is* confusion. Cf. Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group, Inc., 886 F.2d 490, 495 n.3 (2d Cir. 1989) (stating that the Polaroid factors are "at best awkward" when evaluating parody because similarity between the original and the parody is intended).

    When an individual is handed one of defendants' leaflets, both parties agree that the individual will initially think that the leaflet is associated with plaintiffs' restaurant, because the front of the leaflet displays the restaurant's logo.[6] However, the parties also agree that as soon as the individual opens the leaflet and reads the message inside, the individual will immediately realize, based on the critical nature of the message, that the leaflet is not in fact associated with plaintiffs.[7] Therefore, the existence of confusion is not in dispute. Instead, the disagreement centers around whether the confusion created by defendants' use of plaintiffs' trademarks is

---

    [6] Defendants admitted at the initial hearing that "the logo is what catches the eye and gets someone's attention." (TRO Hr'g Tr. 11, Mar. 7, 2006.)

    [7] When asked at the initial hearing whether "a person looking at [a leaflet] is going to mistakenly believe that th[e] message is endorsed by [plaintiffs]," plaintiffs responded "No." (TRO Hr'g Tr. 6, Mar. 7, 2006.)

sufficient to meet the Lanham Act's requirement.

Plaintiffs and defendants focus their arguments on the doctrine of initial interest confusion. That doctrine states that confusion exists for purposes of the Lanham Act when "potential customers initially are attracted to the junior user's mark by virtue of its similarity to the senior user's mark, even though these consumers are not actually confused at the time of purchase." Jordache Enters., Inc. v. Levi Strauss & Co., 841 F. Supp. 506, 514-15 (S.D.N.Y. 1993). In Mobil Oil Corp. v. Pegasus Petroleum Corp., the Second Circuit applied the doctrine to the defendant's use of the plaintiff's "Pegasus" mark. The Court acknowledged that any customer who actually did business with defendant would be aware, at the time the business was transacted, that the defendant was in no way related to the plaintiff. 818 F.2d 254, 259 (2d Cir. 1987). However, the Court held that a likelihood of confusion existed for purposes of the Lanham Act based on the possibility that a customer might accept a phone solicitation from the defendant due to the defendant's use of the plaintiff's mark, despite the fact that any confusion would be later dispelled. Id.

Defendants recognize that our Court of Appeals has adopted the doctrine of initial interest confusion. However, defendants argue that the doctrine does not apply to the instant matter because, while defendants admittedly use plaintiffs' marks to initially attract the attention of passers-by, they do not redirect "potential customers from Plaintiffs' goods or services to Defendants' own goods or services." (Def. Mem. 8.) Essentially, defendants seek to limit the doctrine of initial interest confusion to cases involving "one business's use of another's mark for its own financial gain." Lamparello v. Falwell, 420 F.3d 309, 317 & n.5 (4th Cir. 2005). The Court declines defendants' invitation to so limit the doctrine.

At least one court has explicitly adopted the position advocated by defendants.[8]  In Lamparello v. Falwell, the Fourth Circuit rejected Jerry Falwell's argument that the defendant's use of the website www.falwell.com constituted confusion under the Lanham Act, because the defendant did not "profit[] financially from [the] initial interest confusion" caused by his use of Falwell's name in the website's address.  Id.  In support of its conclusion, the Lamparello Court noted that cases applying the doctrine of initial interest confusion uniformly involve a defendant's use of a competitor's mark to divert customers for the defendant's financial gain.  Id. 317 & n.5.  That observation is similarly true with respect to cases in this Circuit.  Jordache v. Levi Strauss involves "customers" being "attracted" to the defendant's product prior to an eventual "purchase."  841 F. Supp. at 514-15.  Mobil Oil discusses possible confusion during "the initial phases of a deal."  818 F.2d at 259.  Similarly, the Court of Appeals in Steinway & Sons applied the doctrine to a competitor's use of the name Steinweg, because a consumer familiar with the famous Steinway pianos might have considered, at least initially, purchasing or investigating Steinweg pianos based on the belief that they were somehow associated with Steinway.  Grotrian, Helfferich, Schultz, Th. Steinweg Nachf. v. Steinway & Sons, 523 F.2d 1331, 1342 (2d Cir. 1975).  In all of these cases the application of the initial interest confusion

---

[8] Defendants cite BigStar Entertainment, Inc. v. Next Big Star, Inc., 105 F. Supp. 2d 185 (S.D.N.Y. 2000), as another example of a court limiting the initial interest confusion doctrine to cases where the parties are competitors.  Defendants' reliance is misplaced.  The BigStar Court concluded that based on the dissimilarity of the parties' marks, and the lack of competition between the parties, it was unlikely that there would be any *actual* confusion, initial or otherwise.  Id. at 210.  Accordingly, the Court refused to apply the doctrine.
Commercial competition between parties, or the lack thereof, is certainly a factor to be considered in determining whether a consumer is likely to be confused by a defendant's use of a plaintiff's mark or a mark similar to plaintiff's.  However, in a case such as the instant matter, where the parties agree that there is confusion, an analysis of the likelihood of confusion based on similarity or commercial competition is unnecessary.

doctrine serves to prevent an infringing party from gaining an unfair commercial advantage through the use of a plaintiff's mark.

Defendants and the Fourth Circuit are correct that prior cases applying the doctrine of initial interest confusion involved competitors seeking to gain a commercial advantage. This Court, however, respectfully disagrees with the conclusion of the Fourth Circuit, and the position advanced by defendants, that the case law imposes a commercial or for-profit *limit* on the application of the doctrine. Rather, the cases simply reflect the unsurprising fact that the typical trademark infringement case involves commercial competitors. The Lanham Act, however, does not only apply to typical cases.

The text of the statute provides no support for the commercial advantage requirement advanced by defendants. Rather, the Lanham Act prohibits the use of "*any* reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with . . . *any* goods or services . . . [that] is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(a) (emphasis added). The Act's repeated use of the word "any" supports the conclusion that Congress's "clear purpose [was] to outlaw the use of trademarks which are likely to cause confusion, mistake, or deception *of any kind*." <u>Syntex Labs., Inc. v. Norwich Pharmacal Co.</u>, 437 F.2d 566, 568 (2d Cir. 1971). Accordingly, as discussed above, our Court of Appeals has explicitly refused to adopt a for-profit requirement in connection with the Act's provisions pertaining to goods and services. <u>See</u> <u>United We Stand</u>, 128 F.3d at 92. That door having already been closed, defendants now argue that a for-profit competition requirement should be applied to the initial interest confusion doctrine. Defendants, however, are attempting to fit a square peg into a round hole.

The limitation defendants seek would most appropriately apply, if at all, to the goods and services provisions of the Act. Those provisions pertain to the behavior of the parties, the nature of their businesses, and the use of the trademark. If courts were to adopt a limitation on the parties or the uses of the mark to which the Act applied, that limitation would most likely be based on the provisions of the Act that actually pertain to the parties or the uses of the mark. The confusion provision, on the other hand, pertains to the effect of that use on the public at large. The Lanham Act seeks to protect the public from "confusion of any kind," Syntex Labs., 437 F.2d at 568, and the effect on the public is no different whether one party is profiting from its use of the other's mark or whether the parties are in competition with each other. If the public is confused, the harm the Act seeks to prevent has occurred.

That is not to say that profit and competition are not relevant to the Lanham Act as a general matter. As will be discussed below, those matters are both relevant on the question of harm. Additionally, where the existence of confusion is in issue, competition between the parties is relevant to determining the likelihood of confusion. See Polaroid, 287 F.2d at 495 (listing "proximity of the products" as a factor to consider). For example, a company's use of the name "Steinweg" in connection with selling pianos is more likely to result in confusion than use of the name "Steinweg" in connection with selling energy drinks, due to the competitive proximity between Steinweg pianos and Steinway pianos. However, in cases such as the instant matter, it is not necessary to inquire into competitive proximity to determine the likelihood of confusion, because the parties essentially agree that initial confusion exists.

Defendants' use of plaintiffs' marks causes confusion, and therefore falls within the scope of the Lanham Act. Despite defendants' lack of profit motivation, or the lack of

competition between the parties, an individual who is handed one of defendants' pamphlets is, at least initially, confused about the source of the pamphlet. Under the doctrine of initial interest confusion, that confusion is sufficient to trigger the protection of the Lanham Act.

Defendants' claim that they are not "divert[ing] or redirect[ing] . . . potential customers from Plaintiffs' goods or services to Defendants' own goods or services" (Def. Mem. 8) is simply inaccurate. Defendants base their claim on the assertion that customers from plaintiffs' restaurants are not diverted to Colors, the restaurant partially owned by defendants.[9] That assertion may be accurate, but it is also irrelevant, because Colors is not the only good or service that defendants are offering. As discussed above, "Defendants' own goods and services" include the distribution of leaflets to educate the public about plaintiffs' employment practices. Accordingly, defendants *are* redirecting customers to their goods and services, as those goods and services have been defined by the Court. That redirection occurs as a result of confusion, and therefore defendants' use of plaintiffs' marks causes confusion under the Lanham Act.

D. <u>The First Amendment</u>

Plaintiffs appear likely to succeed on all four elements of their infringement claims under the Lanham Act. Defendants, while disputing this conclusion, also assert that their actions are protected by the First Amendment. (Def. Mem. 8-10.) However, because defendants' use of plaintiffs' marks serves to identify the source of defendants' leaflets, and is not part of defendants' expressive message, the First Amendment does not protect their conduct.

---

[9] At the initial hearing on this matter, plaintiffs claimed that Colors was a restaurant in direct competition with plaintiffs' restaurants, despite the distance between the establishments, because Colors and plaintiffs' restaurants are "fine dining" or "destination" restaurants. (TRO Hr'g Tr. 4, Mar. 7, 2006.) However, plaintiffs have abandoned this argument, as it is not mentioned anywhere in their briefs.

"[T]he First Amendment confers a measure of protection for the unauthorized use of trademarks when that use is a part of the expression of a communicative message." Yankee Publ'g Inc. v. News Am. Publ'g Inc., 809 F. Supp. 267, 276 (S.D.N.Y. 1992).  Defendants are correct "that a markholder cannot shield itself from criticism by forbidding the use of its name in commentaries critical of its conduct." Lamparello, 420 F.3d at 318 (internal quotation marks omitted).  Defendants are certainly engaged in the expression of a communicative message that is critical of plaintiffs.  However, the fact that defendants are engaged in some critical expression does not shield all of defendants' conduct from application of the Lanham Act.  The relevant issue is not the content of defendants' message, but rather defendants' use of plaintiffs' marks.

When resolving the somewhat competing protections of the Lanham Act and the First Amendment, courts have distinguished between uses of a mark "for an expressive purpose such as commentary, comedy, parody, news reporting or criticism," and uses of a mark to identify the source of a message.  United We Stand, 128 F.3d at 93.  The First Amendment protects an individual's right to speak out against a markholder, but it does not permit an individual to suggest that the markholder is the one speaking.

Here, defendants use plaintiffs' marks as a source identifier, and therefore defendants' use is not protected by the First Amendment.  The fact that defendants' message is critical as a general matter is not dispositive, because the use of the mark and not the content of the message is the focus of the inquiry.  Irrespective of the content of defendants' leaflets, defendants are using plaintiffs' marks on the cover of the leaflets to indicate that plaintiffs are the source of the leaflets.  "This is precisely the use that is reserved by the Lanham Act to the owner of the mark. . . . It is not protected by the First Amendment." United We Stand, 128 F.3d at 93.

II.  Likelihood of Success of Plaintiffs' Dilution Claims

Plaintiffs bring their claims of trademark dilution under 15 U.S.C. § 1125(c) and N.Y. Gen. Bus. Law § 360-*l*.  To succeed on their claim under § 1125(c) plaintiffs must show: (1) that their marks are famous, (2) that defendants' use of their marks is "commercial use in commerce," (3) that plaintiffs' marks were famous before defendants began using them, and (4) that defendants' use of the marks "dilutes the quality" of the marks.  See Savin Corp. v. Savin Group, 391 F.3d 439, 448-49 (2d Cir. 2004).

New York law provides more protection against dilution than does the Lanham Act.  To succeed on their § 360-*l* claims, plaintiffs must show (1) that they possess distinctive trademarks, and (2) that defendants' use of those trademarks results in a likelihood of dilution.  See Malletier v. Bourke, Inc., 340 F. Supp. 2d 415, 435 (S.D.N.Y. 2004); see also N.Y. Gen. Bus. Law § 360-*l* ("Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief . . .  notwithstanding the absence of competition between the parties or the absence of confusion . . . .").

Plaintiffs' dilution claims are unlikely to succeed for a variety of reasons.  First, plaintiffs do not argue or present any evidence that their marks are "famous," as required by § 1125(c), or "distinctive," as required by § 360-*l*.  Courts consider various types of evidence when determining whether a trademark is famous or sufficiently distinctive: the amount of advertising and other promotions, consumer studies, attempts to plagiarize the mark, duration of use, and media coverage of the mark.  See, e.g., Strange Music, Inc. v. Strange Music, Inc., 326 F. Supp. 2d 481, 489 (S.D.N.Y. 2004); see also id. at 496 (stating that "distinctiveness" under New York law is evaluated using the same factors that are employed when evaluating the strength of a mark

14

under federal law). In support of the claim that their marks are famous or sufficiently distinctive, plaintiffs offer only an affidavit stating that plaintiffs' marks are "widely recognized by customers as being associated with the high quality dining experience offered by" plaintiffs. (Duffy Aff. ¶¶ 6, 10.) This self-serving affidavit, relating only to plaintiffs' customers and not to the public at large, is insufficient to support a finding that plaintiffs' marks are famous or sufficiently distinctive to warrant protection under state or federal dilution statutes.[10]

Furthermore, unlike plaintiffs' infringement claims, § 1125(c) contains the additional requirement that defendants' use be "commercial use in commerce." Therefore, activities that would qualify as "goods and services" under the broad definition given to those terms in § 1125(a), do not fall within the scope of § 1125(c) unless they are performed for profit. <u>See</u> McCarthy on Trademark and Unfair Competition § 24:90 (4th ed. 2006) (stating that § 1125(c)'s commercial use requirement implies that goods or services must be bought or sold). Here, plaintiffs present no evidence that defendants' use of the marks is commercial. Indeed, while plaintiffs argue that defendants' use satisfies the Lanham Act's "in commerce" and "goods and services" requirements, their briefing is void of any mention of § 1125(c)'s special "commercial use" requirement.

Finally, plaintiffs misstate the law when they assert that the Lanham Act merely requires a showing of "likelihood of dilution." (Pl. Mem. 16.) In <u>Moseley v. V Secret Catalogue, Inc.</u>, the Supreme Court made clear that a plaintiff must show *actual* dilution to succeed on a dilution

---

[10] In some instances, trademarks are granted a presumption of distinctiveness. <u>See</u>, <u>e.g.</u>, <u>Savin</u>, 391 F.3d at 451. However, plaintiffs have not argued that any presumption applies, and therefore defendants have not had an opportunity to present evidence or arguments that could rebut any such presumption. Accordingly, the Court will not address the applicability of any such presumption on this motion.

claim under the Lanham Act.  537 U.S. 418, 433 (2003).  Actual dilution can be established

through circumstantial evidence, and the fact that defendants here are using plaintiffs' exact

marks could create a presumption of dilution, if plaintiffs' marks were famous.  See Savin, 391

F.3d at 452.  However, as stated above, plaintiffs have presented no evidence that would tend to

show that their marks are sufficiently famous to warrant such a presumption.  Therefore, on the

current record the Court cannot conclude that plaintiffs are likely to succeed on this element of

their claim.

Accordingly, for the reasons stated above plaintiffs have neither shown a likelihood of

success on the merits nor sufficiently serious questions regarding the merits of their dilution

claims.

III.  Irreparable Harm

Plaintiffs have shown a likelihood of success on the merits of their trademark

infringement claims.  Therefore, plaintiffs are entitled to a preliminary injunction if they

demonstrate a likelihood of irreparable harm.  Here, plaintiffs have demonstrated a likelihood of

confusion, and ordinarily "proof of a likelihood of confusion establishes . . . irreparable harm."

Brennan's Inc. v. Brennan's Restaurant, L.L.C., 360 F.3d 125, 129 (2d Cir. 2004).  However,

this is not an ordinary case.  On the record before the Court plaintiffs have not established a

likelihood of irreparable harm, and therefore an injunction will not issue.

Plaintiffs present no evidence that they will suffer irreparable harm in the absence of an

injunction.  Rather, plaintiffs simply rely on the law of this Circuit that states confusion is

sufficient to establish irreparable harm.  (Pl. Mem. 10.)  The law, however, is not as cut and

dried as plaintiffs assert.  Plaintiffs correctly cite Brennan's for the proposition that "proof of a

likelihood of confusion establishes . . . irreparable harm." 360 F.3d at 129. Other panels of our Court of Appeals, however, have formulated the standard somewhat differently. In other cases, our Court of Appeals has stated that "a *presumption* of irreparable harm arises in Lanham Act cases once the plaintiff establishes likelihood of success," King v. Innovation Books, 976 F.2d 824, 831 (2d Cir. 1992) (emphasis added), that "a preliminary injunction should *usually* issue when the use of a mark creates a likelihood of confusion," Church of Scientology Int'l v. Elmira Mission of the Church of Scientology, 794 F.2d 38, 41 (2d Cir. 1986) (emphasis added), and that "a showing of confusion . . . *ordinarily* will establish that a risk of irreparable harm exists," Gen. Motors Corp. v. Gibson Chem. & Oil Corp., 786 F.2d 105, 109 (2d Cir. 1986) (emphasis added).

This doctrine of inferring irreparable harm from a likelihood of confusion is rooted in Omega Imp. Corp. v. Petri-Kine Camera Co., 451 F.2d 1190 (2d Cir. 1971). In Omega, the Court of Appeals stated that irreparable harm "almost inevitably follows" from a likelihood of confusion for a number of reasons: It is difficult to calculate the profits a defendant obtained, and that would therefore be disgorged, due to its use of plaintiff's mark; confusion may cause consumers to reject both plaintiff's and defendant's products; and calculating lost sales due to defendant's infringement is extremely difficult. Id. at 1195. These factors are present in virtually every case, which explains this Circuit's general rule that irreparable harm follows from likelihood of confusion.

The general rule, however, does not apply in all cases. In Citibank, N.A. v. Citytrust, the Second Circuit reversed a district court's finding that the plaintiff had established irreparable harm, because the district court based its conclusion solely on the fact that plaintiff had established a likelihood of confusion. 756 F.2d 273, 275 (2d Cir. 1985). The Citibank Court

noted that the factual record before it was different from the record in Omega, and that therefore the presumption that existed in Omega could not be blindly applied without additional consideration. The district court's "perfunctory comment" and citation to Omega was held to be insufficient to establish irreparable harm. Id. at 275-76.

On the record before this Court, plaintiffs' perfunctory citation to Brennan's and reliance on the general presumption of irreparable harm is similarly insufficient. The general presumption is not automatic; the case law in this Circuit "leaves the door slightly ajar perhaps for those few cases . . . where irreparable harm does not follow [from likelihood of confusion]." Church of Scientology, 794 F.2d at 42. This is one such case.

None of the factors present in Omega is present in the instant matter. Defendants use plaintiffs' marks to pique the interest of passers-by in the hope that they will take and read one of defendants' leaflets. Defendants do not profit from the distribution of the leaflets, and therefore there would be no need to engage in a speculative disgorgement calculation should plaintiffs prevail at trial. Furthermore, there is no risk that individuals, frustrated by the confusion caused by defendants' use of plaintiffs' marks, will simply turn away from plaintiffs' restaurants and defendants' leaflets. Unlike the confusion at issue in Omega, the confusion here at issue is dispelled almost instantly when a passer-by reads the contents of defendants' pamphlet. Accordingly, there is no lingering confusion that could result in an irreparable loss of customers. Finally, defendants' use of plaintiffs' marks is unlikely to cause plaintiffs to lose *any* sales due to defendants' infringement. Defendants' use of plaintiffs' marks undoubtedly causes some passers-by to reads one of defendants' leaflets who otherwise would not have done so. That confusion, however, will not result in any loss of sales for plaintiffs. Confusion may lead a

potential customer to pick up a leaflet, but it is not that confusion that drives the customer away from plaintiffs' restaurant. Rather, it is the *message inside the leaflet* that might cause the reader to choose to dine elsewhere. That harm, however, results from defendants' criticism, not defendants' use of plaintiffs' marks, and therefore it cannot provide the irreparable harm necessary to support an injunction under the Lanham Act.

A comparison to the typical case of initial interest confusion is illustrative. In such a case, a defendant uses plaintiff's mark to redirect an individual from plaintiff's goods or services to defendant's goods or services. Once the individual is presented with defendant's goods or services, he realizes that defendant is not plaintiff, and that defendant's goods or services are not the same as plaintiff's goods or services, but at that point defendant has already secured a foot in the door and an unfair advantage with respect to plaintiff. The individual could, of course, simply return to plaintiff's goods or services, but some individuals won't bother, either due to inconvenience or ambivalence, and therefore defendant has stolen away some customers that, but for defendant's luring away, would have gone to plaintiff. Accordingly, in the general case, defendant's misdirection leads to fewer individuals purchasing plaintiff's goods or services, and that harm is presumed to be irreparable.

The general case distinguishable from the instant matter. Defendants' service is to hand out an expressive pamphlet outside of plaintiffs' restaurants; they do not divert or misdirect potential customers away from plaintiffs' restaurants. After an individual takes and reads one of defendants' pamphlets, she is in the same position with respect to the restaurant that she was before she had read the pamphlet – standing right in front of the restaurant – and she can enter just as easily as she could have moments before. Unlike the typical case, defendants' use of

plaintiffs' marks does not frustrate individuals' attempts to purchase plaintiffs' goods and

services, because individuals have not been diverted from plaintiffs' restaurants. Furthermore,

and also unlike the typical case, defendants' service is not a substitute for plaintiffs' restaurants.

In Steinweg, for example, someone who purchased a Steinweg piano most likely would not also

purchase a Steinway piano, thereby robbing Steinway a sale. Here, however, a potential diner

who accepts and reads one of defendants' leaflets is presumably still hungry after the leaflet is

read. Any diversion of customers from the plaintiffs' restaurants is the result of defendants'

substantive message. Such "harm" is not the concern of the Lanham Act, which protects against

unfair use of trademarks, not against competition in the marketplace of ideas.[11]

The unique facts of this case make it one of "those few cases . . . where irreparable harm

does not follow from [likelihood of confusion]." Church of Scientology, 794 F.2d at 42. The

harm claimed by plaintiffs results from the content of defendants' message, not from defendants'

use of plaintiffs' trademark. Plaintiffs cannot obtain an injunction based on the content of

defendants' expressive message, see United States v. Quattrone, 402 F.3d 304, 310 (2d Cir.

2005) (explaining First Amendment protection against content-based prior restrictions on

speech), and the fact that defendants are using plaintiffs' marks does not allow plaintiffs to dress

---

[11] The fact that plaintiffs' ability to serve customers in their restaurants is not affected by
defendants' use of their marks distinguishes this case from those in which both plaintiff and
defendant provide information services. For example, the plaintiff in Planned Parenthood Fed'n
of Am., Inc. v. Bucci provided both practical "reproductive services" and political information
services. No. 97 Civ. 0629, 1997 WL 133313, at *4 (S.D.N.Y. Mar. 24, 1997). Defendant's use
of plaintiff's mark in that case inhibited plaintiff's ability to disseminate its own political
message, resulting in irreparable harm that supported a preliminary injunction. Id. at *5-*6.
Here, plaintiffs do not claim that defendants' substantive message is interfering with any
substantive message of their own. Accordingly, any such interference cannot provide a the basis
for a preliminary injunction as it did in Planned Parenthood.

up their request for a prior restraint on speech as an injunction under the Lanham Act. The record before the Court is insufficient to show that plaintiffs face a likelihood of irreparable harm from defendants' use of their marks in the absence of an injunction.

## CONCLUSION

Plaintiffs have failed to show a likelihood of success on the merits with respect to their trademark dilution claims, but have shown a likelihood of success with respect to their trademark infringement claims. However, plaintiffs have failed to establish a likelihood of irreparable harm in the absence in injunction relief. Accordingly, plaintiffs' motion for preliminary injunction is denied.


SO ORDERED.

Dated: New York, New York
     July 6, 2006

                                   GERARD E. LYNCH
                               United States District Judge